JASON FLORES-WILLIAMS
LAW OFFICE OF JASON FLORES-WILLIAMS
1851 BASSETT, STE 509
DENVER, CO 80202
303-514-4524
JFW@JFWLAW.NET
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| THE COLORADO RIVER ECOSYSTEM, <br><br> a/n/f <br><br> DEEP GREEN RESISTANCE, THE SOUTHWEST COALITION, DEANNA MEYER, JENNIFER MURNAN, FRED GIBSON, SUSAN HYATT, WILL FALK. <br><br> Plaintiff, <br><br> vs. <br><br> STATE OF COLORADO <br><br> Defendant. | Case No.: [Number] <br><br> **COMPLAINT FOR DECLARATORY RELIEF** |

COMPLAINT FOR DECLARATORY RELIEF - 1

## I. __INTRODUCTION__

Our system of law has failed to stop the degradation of the natural environment, and consequently, has failed to protect the natural and human communities which depend on it for their survival and livelihood. Environmental law has failed to protect the natural environment because it accepts the status of nature and ecosystems as property, while merely regulating the rate at which the natural environment is exploited. Its failure can be seen from the worsening of climate change, the continued pollution of ground and surfacewater, and the decline of every major ecosystem on the continent.

The Colorado River is one such ecosystem. Climate change is worsening Colorado River droughts, many of its tributaries have receded, and the River has been prevented from making its way to the sea. The Colorado River's continuing existence, let alone its ability to continue to provide sustenance for both human and natural communities, is now at issue.

Faced with similar threats to important ecosystems, courts and legislatures around the globe have begun to create a new kind of environmental law, one which recognizes that ecosystems themselves possess certain rights, and which allows communities to sue on their behalf for damages caused to the ecosystem. By recognizing standing on behalf of the ecosystem itself, injuries caused to the ecosystem are directly recoverable, rather than being dependent solely on harms caused to the users of those ecosystems. Much in the same way that African-Americans and women became "visible" to courts in the 1800's, courts and legislatures now are making ecosystems visible to the institutions of government.

Through this action, the Plaintiffs are asking this Court to recognize and declare that the Colorado River is capable of possessing rights similar to a "person," and that as part of that declaration, that the Colorado River has certain rights to exist, flourish, regenerate, and naturally

COMPLAINT FOR DECLARATORY RELIEF - 2

evolve. In the absence of such a finding, Plaintiffs contend that existing environmental laws will continue to fail to protect the Colorado River, and thus, continue to fail to protect the human and natural communities that are dependent on the River.

## II.   PARTIES

### A. THE COLORADO RIVER

1.  No ecosystem is more responsible for the facilitation of life - human and non-human - in the arid Southwest than the Colorado River.

2.  Human language lacks the complexity to adequately describe the Colorado River Ecosystem. Any attempt to define it or account for the sheer amount of life made possible by it will necessarily be arbitrary

3.  Nevertheless, we are asked to bring an accurate description of the Colorado River from the vastness of the real, physical world into the small confines of a courtroom. We shall start with this: The Colorado River Ecosystem is best understood as a complex collection of relationships.

4.  These relationships are nearly infinite. The most fundamental include the attraction between hydrogen and oxygen; the liquid, ice, and gas that water and heat create together; the irresistible paths fashioned by the interplay of mountain and gravity; and the climate born from the intercourse of the Sun's energy and Earth's atmospheric gasses.

5.  If we begin with water, we see - high in the sky - water dancing as vapor on wind currents. When the dance brings enough water together, clouds form. As clouds pass over the high Colorado Rockies, water freezes and falls as snow. Over the course of winter, clouds contribute their stores of water and snowpack builds. In Spring, snowmelt forms

COMPLAINT FOR DECLARATORY RELIEF - 3

creeks and streams who are guided by mountains through canyons and valleys. Rare summer rains do what they can to join the snowmelt.

6.  Beneath the Earth's surface, springs pull groundwaters to form their own creeks and streams. Snowmelt, rain, and spring waters intermingle with gravity. And, gravity gathers these waters as they tumble down stone faces, run across tree roots, and seep into sand and soil. The snowmelt, spring water, and gravity build in power as they mix. They soften mountainsides, carve through red rock, and brave the deserts who seek to exhaust them.

7.  The moving waters that create the Colorado River and sustain countless species of flora and fauna cover much more expansive distances than the space between riverbanks commonly understood as the "Colorado River."

8.  The traditional conception of the Colorado River locates the river's headwaters in La Poudre Pass, in Colorado's Rocky Mountains. Before the construction of dams and large-scale diversion, the Colorado flowed 1,450 miles into the Pacific Ocean near Sonora, Mexico. Since the completion of the Glen Canyon Dam in 1963, the Colorado has rarely connected with the sea.

9.  The Colorado River Drainage Basin is the seventh largest drainage basin in North America, covering 246,000 square miles. Ninety-seven percent (97%) of the drainage basin is in the United States. Twenty-five significant tributary rivers join the Colorado River, including the Green, Gila, San Juan, Little Colorado, Dolores, Gunnison, and Virgin Rivers.

10.  Fourteen native fish lived in the Colorado River when European settlers arrived in the West, including four fish that are now endangered: the humpback chub, Colorado

pikeminnow, razorback sucker, and bonytail. Only six known humpback chub populations persist. Colorado pikenminnow are no longer found below the Glen Canyon Dam. Wild populations of bonytail no longer exist. Endangered fish species with restricted ranges in Colorado tributaries include the Little Colorado spinedace, Kendall Warm Springs dace, desert pupfish, and springfish.

11. Springs that feed the Colorado, and the Colorado's tributaries, support several species of very rare snails including the Overton assiminea, Grand Wash springsnail, Pahranagat pebblesnail, Moapa pebblesnail, and Hot Creek pebblesnail.

12. The Colorado River's natural communities include a diversity of forest and flora including dense spruce-fir, pinyon-juniper, and mixed broadleaf and cottonwood forests; moist mountain grasslands where tufted hair grass, Thurber's fescue, and blue joint grass flourish; prolific willow carrs; desert scrublands; and sparse saltbush-greasewood basins.

13. The Colorado River's riparian communities are among the most important habitats for winged creatures in the Western United States. One hundred and thirty-nine (139) confirmed butterfly species can be found in Rocky Mountain National Park, alone. Iconic, and endangered or threatened, birds like the bald eagle, greater sage grouse, Gunnison sage grouse, peregrine falcon, yellow-billed cuckoo, summer tanager, and southwestern willow flycatcher make their homes in the Colorado River watershed.

14. The scarcity of water in the deserts of the Southwest make the Colorado River Watershed vital for several amphibian species including the Colorado River toad, lowland leopard frog, and the relict leopard frog. Development and water diversion endanger these rare desert amphibians.

COMPLAINT FOR DECLARATORY RELIEF - 5

15. Many of the West's most recognizable mammals depend on the Colorado River Watershed for water and to sustain adequate food sources. Gray wolves, grizzly bear, black bear, mountain lions, coyotes, and lynx walk the banks of the Colorado. Elk, mule deer, and bighorn sheep live in the Basin's forests. Beavers, river otters, and muskrats live directly in the River's flow as well as in streams and creeks throughout the Colorado River Basin.

16. The Colorado River provides water for close to 40 million people and irrigates nearly 4 million acres of American and Mexican cropland.

17. In 1922, the Colorado River Compact allocated the River's water between 7 states (Colorado, New Mexico, Utah, Wyoming, Nevada, Arizona, and California). The Compact set the River's annual average at 15 million acre feet ("maf") and used this number to distribute water among the states. Between 1914-1923, the River's annual average was 18.8 million acre feet which is the wettest recorded ten-year period of the last 100 years. The River now averages 14.7 million acre feet annually.

18. Thirty-four (34) Native American reservations exist within the Colorado River Basin, many of whom seek new water rights not contemplated in the Colorado River Compact. In 1944, the International Boundary Water Commission facilitated a treaty between the United States and Mexico which granted Mexico 1.5 million maf annually.

19. Agriculture uses the vast majority of the Colorado's water. In 2012, 78% of the Colorado's water was used for agriculture alone. Forty-five percent (45%) of the water is diverted from the Colorado River Basin which spells disaster for Basin ecosystems. Major cities that rely on these trans-Basin diversions include Denver, Los Angeles, and Salt Lake City.

**B. DEEP GREEN RESISTANCE AND DEEP GREEN RESISTANCE MEMBERS AS NEXT FRIENDS**

20. Members of DEEP GREEN RESISTANCE ("DGR") serve as "next friends," for, and guardians of, the Colorado River Ecosystem.  DGR is a worldwide, membership-based, grassroots organization rooted in the truth that all life is sustained by soil, air, water, and countless natural communities of living creatures. Because ecosystems sustain life, DGR recognizes that the needs of ecosystems are primary and DGR is committed to protecting vulnerable ecosystems across the planet. DGR, as shown infra, has exemplified a long-standing history of responsible care for the Colorado River Basin.

21. Next Friend and Guardian DEANNA MYER is a member of DGR and DGR's Southwest Coalition and resides at 1680 M Hwy 67 Sedalia, CO 80135.

22. Next Friend and Guardian JENNIFER MURNAN is a member of DGR and DGR's Southwest Coalition and resides at 5125 Ute Hwy Longmont, CO 80503.

23. Next Friend and Guardian FRED GIBSON is a member of DGR and DGR's Southwest Coalition and resides at 6830 Dream Weaver Dr Colorado Springs, CO 80923

24. Next Friend and Guardian SUSAN HYATT is a member of DGR and DGR's Southwest Coalition and resides at 457 Walker St Moab, UT 84532.

25. Next Friend and Guardian WILL FALK is a member of DGR and DGR's Southwest Coalition and resides at 371 N 200 E Heber City, Utah 84032.

26. DEEP GREEN RESISTANCE (DGR) is a social and environmental justice organization formed in 2011. Over the past 6 years, DGR has grown to include members across the nation and worldwide.

27. DGR is committed to the principle that the soil, the air, the water, the climate, and the food we eat, are created by complex communities of living creatures like those creating

COMPLAINT FOR DECLARATORY RELIEF - 7

the Colorado River. The needs of these living communities, worldwide, are primary. Similarly, the needs of the Colorado River, in the American Southwest, are primary. Local, state, and national jurisprudence must emerge from a humble relationship with the living communities which give us life.

28. DGR engages in a diversity of tactics to protect ecosystems. This includes building public awareness of the interconnectedness of life, the creation and distribution of ecological and political analysis in media worldwide, fundraising to support grassroots campaigns, organizing conferences to bring the most talented minds of the environmental and social justice movements together to discuss strategy, developing activist training programs, and conducting non-violent, civil disobedience to confront ecological violence.

29. Aside from legal definitions, DGR conducts itself as an organization by: (1) publishing by-laws which govern its activities; (2) operating a process for gaining membership which includes a written application and interview; and by (3) conducting an active membership maintenance program where members must either pay monthly dues or file a quarterly written proposal detailing the work the member plans on doing within DGR's mission.

30. SOUTHWEST COALITION is a subcommittee of Deep Green Resistance specifically focused on preserving the Colorado River and the Colorado River Ecosystem.

31. A number of DGR members live in the Colorado River's drainage basin, or live in communities who depend on the Colorado. These include members who live in Moab, UT; Heber City, UT; Boulder, CO; Colorado Springs, CO; and Sedalia, CO. These members form the majority of DGR's SOUTHWEST COALITION.

COMPLAINT FOR DECLARATORY RELIEF - 8

32. Relevant SOUTHWEST COALITION Members are listed individually herein as "next friends" of the natural communities creating the Colorado River: Deanna Meyer, Jennifer Murnan, Fred Gibson, Michael Carter, Susan Hyatt, and Will Falk.

33. In 2015, DGR SOUTHWEST COALITION officially committed to protecting water as its primary focus in a public document titled, "Water: Southwest Coalition Statement of Commitment and Call for Allies." The health of the Colorado River was prioritized in this document.

34. The document states, "More than any other area of North America, the Southwest faces water shortages just as demands for water increase…Deep Green Resistance chapters across the Southwest recognize the imminent catastrophe. We view the protection of ground and surface water as critically important. We declare water preservation and justice as our primary focus…"

35. In 2013, prior to DGR SOUTHWEST COALITION's publication of this document, DGR formed an alliance with members of the Ely Shoshone Tribe and the Great Basin Water Network to oppose the Southern Nevada Water Authority's (SNWA) Groundwater Development Project. The Project, which has still failed to gain the necessary permits, would pump 27 billion gallons of groundwater from southeastern Nevada and transport it by pipeline to service Las Vegas. A significant portion of this water naturally flows into the Colorado River through the White and Moapa Rivers. Stopping SNWA protects billions of gallons of the lower Colorado's water.

36. In opposition to the SNWA Groundwater Development Project, DGR members organize an annual Sacred Water Tour to show the public the natural and human communities that will be destroyed if the Project is approved. Included on this tour are several areas within

the Colorado River Drainage Basin. The 2017 Sacred Water Tour was the event's 4th edition. Additionally, DGR members have engaged in a public awareness campaign about the Project with news and opinion articles in local and national media platforms; and through radio interviews and podcasts, videos, and photo journals.

37. In 2015, in conjunction with DGR SOUTHWEST COALITION's Water Statement, several DGR members formed the Pinyon-Juniper Alliance to oppose the Bureau of Land Management's and U.S. Forest Service's "pinyon-juniper treatment projects." These projects, happening across the Colorado River Basin, clearcut millions of acres of old-growth pinyon-juniper forests to open rangeland for livestock grazing and to clear the way for mine expansions. Pinyon-juniper deforestation contributes to desertification and causes precious high desert topsoil and surface pollution to wash into the Colorado River.

38. The Pinyon-Juniper Alliance circulated a petition asking BLM to place a moratorium on pinyon-juniper treatment projects while conducting additional research into how, among other things, deforestation affected the Colorado River. The petition gained over 61,787 signatures. DGR members are also involved in organizing experts in the scientific and ecologic communities to speak out against pinyon-juniper deforestation. DGR members wrote a widely-shared essay series about pinyon-juniper deforestation, made videos, and gave radio interviews on the topic.

39. DGR SOUTHWEST COALITION recently approved a plan to build a water protection and climate change action campaign in Northeastern Utah. The plan targets oil and natural gas hydraulic fracturing (fracking) processes around the Duchesne River which is a major tributary of the Colorado River. Fracking is known to pollute ground and surface water sources. The plan also targets the yellow crude oil refining process in Northeastern

Utah which involves heated oil tanker trucks carrying volatile, toxic oil along highways running near creeks, streams, and the Duchesne River, which all empty into the Colorado River. An educational component of the plan seeks to illustrate how climate change threatens the snowpack that feeds the Colorado River and how fracking produces toxic runoff that may find its way to the River.

40. Defendant John Hickenlooper is the Governor of the State of Colorado, and is being sued in his official capacity as the executive of the State. The Governor's Office is located at 136 State Capitol Building, Denver, Colorado 80203.

### III.     JURISDICTION and VENUE

30. Diversity is extant between Plaintiff and Defendant so that jurisdiction is proper pursuant to 28 U.S.C. § 1332.

31. This Court is vested with original jurisdiction over these federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

32. This Court is vested with authority to grant the requested declaratory judgment by operation of 28 U.S.C. §§ 2201 and 2202, and pursuant to Federal Rule of Civil Procedure 57.

33. Venue is proper in the United States District Court for the District of Colorado under 28 U.S.C. § 1391(b), in that the events giving rise to the claim occurred within the district.

### IV.     BACKGROUND OF CLAIMS

COMPLAINT FOR DECLARATORY RELIEF - 11

35. Life is created by complex natural communities of living creatures in ecosystems. Water, air, soil, climate, and the food we eat depend on natural communities. The needs of these communities are primary; individual morality, institutional morality, and Law must emerge from a humble relationship with these natural communities. True sustainability is impossible without such a relationship.

36. For the vast majority of human history, humans lived in humble relationships with natural communities. We developed traditional cultures that were rooted in the radical interconnectedness of all living beings. Along with other teachings, these cultures insisted upon the inherent worth of the natural communities who give us life.

37. The dominance of a culture that defines Nature as property enables its destruction. Meanwhile, the planet is on the verge of total collapse. To avert collapse, the destruction must stop. For the destruction to stop, institutions within the dominant culture must recognize the inherent worth of the natural communities who give us life. If American courts do not recognize the inherent worth of natural communities, the dominant culture will not change, and collapse will only intensify. American courts must recognize the legally enforceable rights of ecosystems and nature for those reasons.

38. The concept that nature should have the right to sue for its own protection has been recognized by members of the United States Supreme Court. In his dissenting opinion in the landmark environmental law case, *Sierra Club v. Morton*, 405 U.S. 727 (1972), Justice Douglas argued that "inanimate objects" should have standing to sue in court:

> Contemporary public concern for protecting nature's ecological equilibrium should lead to the conferral of standing upon environmental objects to sue for their own preservation.

39. As a practical matter, the difficulty in recognizing this equitable concept (of conferring standing and rights on Natural entities) arises from the fact that nature--which any of us who have spent a day in the Rockies or along The Colorado would never describe as "inanimate"—does not have the ability to hire a law firm, actively participate in its representation or testify in Court. (One shudders at the idea of nature testifying against us. That said, in many real ways, it *is* testifying against us right now.)

40. But as Justice Douglas stated in his dissent, inanimate objects who do not have the ability to testify themselves are commonly parties in litigation. A ship has a legal personality, a fiction found useful for maritime purposes. The corporation sole - a creature of ecclesiastical law – has been deemed to be an acceptable adversary and large fortunes ride on its cases. The ordinary corporation has been repeatedly recognized as a "person" for purposes of constitutional protection and enforcement.

41. Corporate rights provide an instructive analogy. The Colorado is 60 to 70 million years old and has enabled, sustained, and *allowed* for human life for as long as human life has been extant in the Western United States, yet the Colorado has no rights or standing whatsoever to defend itself and ensure its existence; while a corporation that can be perfected in fifteen minutes with a credit card can own property, issue stock, open a bank account, sue or defend in litigation, form and bind contracts, claim Fourth Amendment guarantees, due process, equal protection, hold religious beliefs and perhaps most famously invest unlimited amounts of money in support of its favorite political candidate. See *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 903 (2010). See also, *Burwell v. Hobby Lobby Stores*, Inc., 134 S. Ct. 2751, 2759 (2014).

42. The American system of law is replete with doctrines, examples and solutions with regard to when a party cannot bring suit itself and requires another to stand in its stead, including *guardian ad litems*, *parens patriae*, executors who can bring suits on behalf of an estate, and trustees. The fiduciary relationship in which one party can litigate in the best of interests of another party has long been recognized by U.S. courts.

43. One does not have to wax poetic to reasonably assert that a natural entity that has existed for millions of years as a complex ecosystem, and which created the Grand Canyon through its natural flow has, in many ways, respectfully, more volition or will than some of the dependent persons and entities that are currently represented by guardian *ad litems* and executors in our courts of law. [1]

44. For that reason and others, courts around the world have come to legally recognize that natural entities on which life depends have the right to exist, which in our law is cognized as the standing, and the right, to bring actions to be heard before our courts.

45. On July 27, 2014, Te Urewera, an 821-square mile area of New Zealand, was designated as a legal entity with "[A]ll the rights, powers, duties and liabilities of a legal person." Section 11(1), Te Erewera Act of 2014.

46. Te Urewera can now bring causes of action on its own behalf without having to prove direct injury to human beings.

---

[1] In his 1797 Transaction of the American Philosophical Society, Thomas Jefferson, the chief framer of our constitutional rights, stated:

> The movements of nature are in a never ending circle. The animal species which has once been put into a train of motion, is still probably moving in that train. For if one link in nature's chain might be lost, another and another might be lost, till this whole system of things should vanish by piece-meal; a conclusion not warranted by the local disappearance of one or two species of animals, and opposed by the thousands and thousands of instances of the renovating power constantly exercised by nature for the reproduction of all her subjects, animal, vegetable, and mineral.

COMPLAINT FOR DECLARATORY RELIEF - 14

47. In 2008, the country of Ecuador amended its national constitution to establish the rights

of ecosystems within the country to exist, regenerate, evolve, and be restored. Those

constitutional provisions have triggered several enforcement cases protecting the rights of

rivers and other ecosystems in the country.

48.     In November of 2016, Colombia's Constitutional Court found that

the Atrato River, including its tributaries and watershed, is "an entity subject to rights to

protection, conservation, maintenance and restoration." In addition, the Court decreed

that the Colombian State shall "exercise legal guardianship and representation of the

rights of the river in conjunction with the ethnic communities that inhabit the Atrato river

basin." In its ruling, the court explained

> *that human populations are those that are interdependent on the natural world –*
> *not the other way around- and that they must assume the consequences of their*
> *actions and omissions in relation to nature. It's about understanding this new*
> *socio-political reality with the aim of achieving a respectful transformation with*
> *the natural world and its environment, just as has happened before with civil and*
> *political rights…economic, social and cultural rights…and environmental*
> *rights...Now is the time to start taking the first steps towards effectively protecting*
> *the planet and its resources before it is too late or the damage is irreversible, not*
> *only for future generations but for the entire human species.*
> Const. Ct. of Colombia, Judgment T-622 DE 2016.

49. On March 20, 2017, the High Court of Uttarakhand at Nainital, in the State of

Uttarakhand in northern India, issued a ruling declaring that the Ganges and Yamuna

Rivers are "legal persons/living persons."  This comes after numerous rulings by the

court which found that while the rivers are "central to the existence to half of Indian

population and their health and well being," they are severely polluted, with their very

existence in question. The court declared that throughout India's history, it has been

necessary to declare that certain "entities, living inanimate, objects or things" be declared

as "juristic person[s]."  In the case of the Ganga and Yamuna, the court explained that the time has come to recognize them as legal persons "in order to preserve and conserve" the rivers. (Writ Petition (PIL) No.126 of 2014).

50. Over three dozen municipalities within the United States, including the City of Pittsburgh, have adopted municipal laws recognizing the legally enforceable rights of ecosystems and nature, and the authority of municipal residents to bring suits in the name of individual ecosystems.

51. The Court will rightly concern itself with the question of judicial efficiency with regard to the possibility, which opposing party will almost certainly present, of an unwieldy amount of law suits suddenly being brought on behalf of the Colorado River and the Colorado River Ecosystem by individuals who are well-intentioned and rightly concerned, but who lack the direct relationship and stewardship of the Colorado.

52. This concern is easily addressed by requiring that the filer of the suit evidence a relationship to The Colorado, so that the filer is provably capable of representing its best interests. The same operation of law occurs in class action certifications with regard to certifying representative plaintiffs and class counsel as well as in any adjudication in which a person is appointed *guardian ad litem*.[2]

## V.    COUNTS IN THE NATURE OF DECLARATORY JUDGMENT

## COUNT ONE

## DECLARATORY JUDGMENT

---

[2] For purposes of judicial economy, Fed. R. Civ. P 53 empowers the Court to appoint a special master. In cases where identifiable natural entities such as the Colorado are being threatened or facing extinction, an R.53 appointment could be in place to screen claims brought in the name of the Colorado River Ecosystem.

COMPLAINT FOR DECLARATORY RELIEF - 16

53.     All prior paragraphs of this Complaint are incorporated herein.

54. The Colorado River Ecosystem is essential to life – human and non-human – in the American Southwest.

55. Threats to the Colorado River Ecosystem are threats to life.

56. Because threats to the Colorado River Ecosystem are threats to life, the Colorado River Ecosystem must possess the ability to protect itself from threats to its survival.

57. The ability to protect itself requires that the Colorado River Ecosystem have access to the courts, and that the courts recognize that the Colorado River Ecosystem possesses rights.

58. Recognition of the capacity of Colorado River Ecosystem to possess rights requires a recognition that the Colorado River Ecosystem is a "person" for purposes of asserting those rights.

59. Recognition as a "person" requires that courts find that "next friends," or guardians, may defend and enforce those rights on behalf of the Colorado River Ecosystem.

60. Therefore, the "next friend" Plaintiffs, request that this Court declare that the Colorado River Ecosystem is a "person" capable of possessing rights and securing those rights through enforcement and defense of those rights, and that the Plaintiffs may serve as "next friends" to seek that relief.

## COUNT TWO: DECLARATORY JUDGMENT RELIEF: THE COLORADO RIVER ECOSYSTEM'S RIGHTS

61. All prior paragraphs of this Complaint are incorporated herein.

62. As a "person" pursuant to the law, the Colorado River Ecosystem must possess certain specific rights to protect and defend itself.

63. Basic rights necessary for the protection of the Colorado River Ecosystem inherently include the Colorado River Ecosystem's right to exist, the right to flourish, the right to regenerate, the right to be restored, and the right to naturally evolve.

64. Lacking those basic rights, the Colorado River Ecosystem's status as a "person" would be meaningless, because it would be unable to secure and protect those basic rights, and thus, would be unable to protect its life and existence.

65. Therefore, the Plaintiffs ask this Court to declare that the Colorado River Ecosystem has a right to exist, flourish, regenerate, be restored, and naturally evolve.

**COUNT THREE: DECLARATORY JUDGMENT:**
**STATE ACTIONS VIOLATING ECOSYSTEM RIGHTS**

66. All prior paragraphs of this Complaint are incorporated herein.

67. The Colorado River Ecosystem possesses the right to exist, flourish, regenerate, be restored, and naturally evolve.

68. The rights of the Colorado River Ecosystem establish duties on behalf of the State of Colorado, and all other governments, to respect those rights.

69. Actions taken by Defendant State of Colorado, to approve permits and issue other regulatory approvals for certain actions regarding the Colorado River Ecosystem, may violate those rights.

70. In August 2015, the portal of the Gold King Mine was breached, releasing an estimated three million gallons of mine wastewater and 880,000 pounds of heavy metals down the Animas and San Juan rivers (two of the Colorado's tributaries). This waste flowed into the Colorado River and injured downriver communities. The spill is part of decades of toxic drainage from mines at the headwaters of the Animas River near Silverton, Co.

71. Before the spill, the State of Colorado and Sunnyside Gold Corporation reached a decision to shut down a water treatment plant in favor of placing bulkheads at the entrance of Sunnyside's drainage point, the American Tunnel. Most researchers familiar with the Animas watershed believe the bulkheads caused the mine pool of the Sunnyside Mine to back up and cause other mines including the Gold King to discharge acidic water.

72. Recently, the United States Supreme Court denied the State of New Mexico's motion for leave to file a bill of complaint against the State of Colorado for harms caused. The Court did not write an opinion with the denial. EPA decided to list the Upper Animas Mining District on the Superfund National Priorities list. Apparently, the Court believes that EPA's decision to list the District on the NPL completely resolves the harms that EPA, Colorado, and others wrought on the Animas River, the Colorado River, and downstream.

73. The underlying policy problem here is the American legal system's insistence that the EPA provides adequate protections, and is the only proper mechanism for gaining recourse for injuries to ecosystems.

74. Over-Allotment: One reason the Colorado River rarely reaches the sea is the compacts and laws that regulate how much water can be diverted from the river allow humans to take more water from the river than physically exists. The State of Colorado takes more water from the river than any of the other jurisdictions, save California.

75. The State of Colorado is party to the 1922 Colorado River Compact, the 1948 Upper Colorado River Compact, and a related set of laws, court decrees and an international treaty collectively known as the "Law of the River." The parties to the 1922 compact assumed that the river's flow would remain at a reliable 17 million acre-feet of water per

year. But, hydrologists now know this 17 million acre-feet per year standard represented an unusually high flow and was a mistake. Streamflow records showed that the Colorado River's flow was only 9 million acre-feet in 1902, for example. From 2000-2016, the River's flow only averaged 12.4 million acre-feet per year.

76. Regardless, the 1922 Compact was enacted over calls for time-limited allocations that would allow for the parties to reassess allotments. The Compact's framers divided, in perpetuity, 15 million-acre feet. So, for most of the last 16 years, the States are legally allowed to use more of the Colorado River's water than actually exists.

77. This 15 million-acre feet was further divided with 7.5 million acre-feet allocated to the lower basin states (Arizona, California, and Nevada) and 7.5 million acre-feet allocated to the upper basin states (Colorado, New Mexico, Utah, and Wyoming).

78. In the negotiations, Colorado and the other upper basin states succeeded in barring the application of the Doctrine of Prior Appropriation across states lines to allocation of Colorado River water. The Doctrine of Prior Appropriation is commonly known as "first in time, first in right." In 1948, the Upper Colorado Basin Compact was enacted between Colorado, New Mexico, Utah Wyoming, and Arizona (a small part of Arizona lies in the upper basin) with Colorado receiving most of the Upper Basin's allotted 7.5 million acre-feet. Colorado was allowed 51.75 percent, Utah 23 percent, Wyoming 14 percent, and New Mexico 11.25 percent. The small part of Arizona received 50,000 acre-feet.

79. Dams: Another reason the Colorado River rarely reaches the sea is the presence of dams that block the river's flow. The State of Colorado operates dams on the Colorado River including the Price-Stubb Dam, Grand Valley Diversion Dam, Windy Gap Dam, Granby Dam, and Shadow Mountain Dam. The State also operates dams on major tributaries of

the Colorado River including the Blue Mesa Dam and the Morrow Point Dam on the

Gunnison River, the Dillon Dam and Green Mountain Dam on the Blue River, and the

McPhee Dam on the Dolores River.

80. The State of Colorado has constructed these dams in an effort to seize a larger share of

dwindling water supplies before that water flows downstream.

81. In addition to choking up the Colorado River, dams are disasters for downstream

ecosystems and endemic species. Dams are leading cause of the population collapses of

the Colorado River's four species of endangered fish, the humpback chub, bonytail chub,

Colorado pikeminnow, and razorback sucker. Farther downstream, the world's most rare

marine mammal, the vaquita porpoise who calls the Gulf of California home, is

dangerously close to extinction because the Colorado River rarely reaches the Gulf of

California.

82. The Plaintiffs are asking this Court to declare these and other actions taken by the State

of Colorado, and certain inaction by the State of Colorado, capable of violating the rights

of the Colorado River Ecosystem.


## VI.      REQUEST FOR HEARING


83. Plaintiffs request that this Honorable Court, pursuant to FRCP 65, grant an evidentiary

hearing as the issues herein are of importance to the public interest.


## VII.     NOTICE OF NO RELATED CASES PURSUANT TO D.C.COLO.L Civ R 3.2.

COMPLAINT FOR DECLARATORY RELIEF - 21

84. Pursuant to D.C.COLO.L Civ R 3.2, there are no related or similar cases before any courts. This is a matter of first impression.

## VIII.   DECLARATORY RELIEF SOUGHT

85. Plaintiff the Colorado River Ecosystem seeks a declaration from this Court that:

a.   The Colorado River Ecosystem is a "person" capable of possessing rights;

b.   The Colorado River Ecosystem possesses the rights to exist, flourish, regenerate, be restored, and naturally evolve;

c.   That DGR may serve as guardians, or "next friends," for the Colorado River Ecosystem; and

d.   That certain activities permitted by, or carried out by, the State of Colorado, may violate the rights of the natural communities creating the Colorado River, and that the Plaintiffs may proceed to file for injunctive relief to enjoin the State of Colorado from taking action related to those activities, or to force the State of Colorado to take certain actions, as violations of the rights of the Colorado River Ecosystem.

Respectfully submitted this the **26th** day of **September** 2017,

s/Jason Flores-Williams, Esq.
*Counsel for Plaintiff*
Phone: 303-514-4524
Email: Jfw@jfwlaw.net
1851 Bassett St.
#509
Denver, Colorado 80202